UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
QIYDAAR REDDICK, :
                     Petitioner, :
                     : **MEMORANDUM**
       - against -          **DECISION AND ORDER**
STATE OF NEW YORK, :
                     Respondent. : 14-CV-2809 (AMD)
                     :
--------------------------------------------------------------- X

ANN M. DONNELLY, United States District Judge.

The *pro se* petitioner, currently incarcerated at Five Points Correctional Facility, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner was convicted in Richmond County Supreme Court of Rape in the First Degree, Aggravated Criminal Contempt, and Burglary in the Second Degree, and was sentenced to concurrent prison terms totaling twenty-three years, and twenty-five years' post-release supervision. The petitioner claims that his attorneys were ineffective, and that the DNA expert's testimony was perjured and violated the Sixth Amendment. For the following reasons, the petition is denied.

## BACKGROUND[1]

### I. Overview

The petitioner was convicted of raping his ex-girlfriend, Michelle Niesz, in the early morning hours of May 18, 2009. The petitioner, armed with a knife, kicked in the door to Ms. Niesz's third-floor apartment, grabbed Ms. Niesz, and dragged her outside. He took Ms. Niesz

---

[1] Because the petitioner was convicted, I summarize the facts in the light most favorable to the government. *United States v. Hsu*, 669 F.3d 112, 114 (2d Cir. 2012) (citing *United States v. Riggi*, 541 F.3d 94, 96 (2d Cir. 2008)).

1

to her neighbor's cellar, and where he raped her at knifepoint. Ms. Niesz was able to escape when the police arrived; the petitioner fled through the backyard.

The petitioner was charged with Rape in the First Degree, two counts of Burglary in the Second Degree, Aggravated Criminal Contempt, and Criminal Contempt in the First Degree. The petitioner went to trial before the Honorable Robert Collini and a jury in September 2010. The petitioner was convicted of rape, second-degree burglary, and aggravated criminal contempt, and acquitted of one count of second-degree burglary and first-degree criminal contempt.

## II. Pre-Trial Proceedings

When the petitioner was arraigned on May 29, 2009, he filed notice of his intent to testify before the grand jury. (ECF No. 13-17 at 1.)[2] On June 15, 2009, Richard Kopacz, who was the petitioner's lawyer at the time, informed the court that the petitioner no longer wished to testify before the grand jury. (*Id.*) On June 18, 2009, a grand jury returned an indictment charging the petitioner with Rape in the First Degree, Burglary in the Second Degree, Aggravated Criminal Contempt, and Criminal Contempt in the First Degree. (*Id.*; ECF No. 13-16 at 4.) On June 24, 2009, the petitioner, represented by new counsel Matthew Zuntag, was arraigned on the indictment. (ECF No. 13-17 at 1.)

On January 11, 2010, the petitioner, through counsel, moved to dismiss the indictment, claiming that the petitioner's "prior counsel failed to adequately advise [him] of his right to testify in the Grand Jury." (ECF No. 13-16 at 1–2, 8–9.) The petitioner also claimed that his previous attorney had a conflict of interest because he simultaneously represented both the petitioner and the victim, Ms. Niesz. (*Id.* at 8–10.)

---

[2] All referenced page numbers correspond to those generated by the Court's Electronic Court Filing system, and not the document's internal pagination.

On February 4, 2010, Judge Leonard Rienzi denied the petitioner's motion because the motion was untimely and because his prior counsel's "strategic decision" to withdraw the grand jury notice was not a basis for dismissal. (ECF No. 13-17 at 1–2.)

## III. Trial

The trial commenced on September 16, 2010 before Judge Collini and a jury.[3] (ECF No. 13-22.)

### A. *The Prosecution's Case*

The prosecution called ten witnesses, including the victim, Ms. Niesz, and the medical examiner who confirmed that the petitioner's DNA was in the underwear that Ms. Niesz was wearing the night of the attack. The prosecution presented evidence of Ms. Niesz's order of protection against the petitioner (ECF No. 13-22 at 438:2–15), as well as the testimony the police officer who encountered Ms. Niesz after the rape (*id.* at 442–57), and the nurse who treated her and prepared a rape kit (*id.* at 662–82).

#### 1. Michelle Niesz

Ms. Niesz dated the petitioner from 2006 through October or November 2008 (*id.* at 489:2–3, 492:14–21); they had a baby together in 2007 (*id.* at 542:16–19). Ms. Niesz allowed the petitioner to stay in her apartment even after they broke up. (*Id.* at 492:22–24.) Counsel established on cross-examination that Ms. Niesz's son was in North Carolina with the petitioner's family (*id.* at 544:15–545:6), and that she believed that the petitioner and his family were keeping the child from her, which made her "very upset" (*id.* at 546:24–547:5).[4]

---

[3] Trial counsel was Mark Fonte. (*See* ECF Nos. 13-20–13-22.)

[4] One of the themes of the defense was that Ms. Niesz would "lie and connive about everything" in order to regain custody of her son. (ECF No. 13-22 at 425:11–21.)

3

Sometime around Easter 2009, the petitioner broke into Ms. Niesz's apartment and threatened to kill her. (ECF No. 13-22 at 494:4–16.) The petitioner was arrested and charged with menacing, to which he pled guilty. (*Id.* at 494:20–23; ECF No. 13-20 at 3:3–13.) Ms. Niesz obtained an order of protection (ECF No. 13-22 at 494:7–9) that required the petitioner to "stay away from Michelle Niesz" and "her home," and to "refrain from . . . intimidation, threats or any other criminal offense against her" (*id.* at 439:18–25).

In the early morning hours of May 6, 2009, Ms. Niesz awoke to find the petitioner lying next to her. (*Id.* at 498:9–499:2.) He told her "to give him what he want[ed] or he was going to put [her] to sleep and take what he want[ed]." (*Id.* at 499:4–5.) The petitioner choked Ms. Niesz, causing her to vomit. (*Id.* at 499:15–17.) He took her to the bathroom so that she could clean up. (*Id.* at 499:20–23.) Ms. Niesz refused the petitioner's demand that she go back to the bedroom "to talk." (*Id.* at 499:23–25.) The petitioner left, and Ms. Niesz called the police, but left to take her daughter to school before they arrived. (*Id.* at 500:15–19.) She came home to find that the petitioner was back, and had kicked in her kitchen door. (*Id.* at 500:23–24, 502:3–4.) Ms. Niesz called the police, and the petitioner left. (*Id.* at 500:25–501:3.) The police arrived and took pictures of the apartment. (*Id.*)

On May 18, 2009 at around 3:00 a.m., the petitioner, armed with a knife, returned to the apartment and kicked down the door. (*Id.* at 503:23–25.)[5] He grabbed Ms. Niesz, put the knife to her back, told her that they needed "to talk," and forced her down the stairs. (ECF No. 13-22 at 504:10–14.) Ms. Niesz pleaded with the petitioner to put his knife down, but he told her to be quiet, and at one point, cut her thumb. (*Id.* at 504:15–24, 510:17–20.)

---

[5] Ms. Niesz alerted her two friends, who were asleep on the couch, that the petitioner was in the apartment. (ECF No. 13-22 at 503:18–19.)

The petitioner put the knife in his back pocket, threw Ms. Niesz over his shoulder, and carried her to the side of the house. (ECF No. 13-22 at 510:23–511:2.) She grabbed the knife and tried to throw it over the fence, but the petitioner was able to retrieve it. (*Id.* at 511:3–15.) Ms. Niesz's friend Mohammed came down the stairs, and told the petitioner to "leave [Ms. Niesz] alone" and that he did not "have to do this." (*Id.* at 511:23–25.) The petitioner ignored him and forced Ms. Niesz at knifepoint into a neighbor's cellar. (*Id.* at 512:6–24.) Once inside, the petitioner told Ms. Niesz that he would "take what [he] want[ed]" if she did not give it to him. (*Id.* at 513:3–7.) Ms. Niesz refused, and the petitioner pulled down her sweatpants, and raped her. (*Id.* at 513:8–15.) At one point, Ms. Niesz could hear that the police had arrived; she wrestled the knife from the petitioner's hand. (*Id.* at 513:21–514:10.) She threw the knife into the yard, and the petitioner escaped through the neighbor's backyard. (*Id.* at 514:6–10.) Ms. Niesz ran to the front of the house, and told an officer that the petitioner had raped her and was escaping through the backyard. (*Id.* at 514:12–15.) Ms. Niesz was taken to the hospital, and examined by medical professionals who prepared a rape kit, which included vaginal and oral swabs, her clothing, and debris from her feet. (*Id.* at 517:4–519:6.) The kit was sent to the medical examiner's office for testing. (*See* ECF No. 13-23 at 620:16–621:5.)

*2. Kerry Annitto*

Kerry Annitto, a forensic expert at the Office of Chief Medical Examiner (*id.* at 615:11–13, 617:16–17), testified that the Office examined the rape kit on May 20, 2009 (*id.* at 620:16–621:5). Testing revealed the presence of semen in Ms. Niesz's underwear.[6] (ECF No. 13-23 at 622:20–24.) Ms. Annitto compared the petitioner's DNA with the DNA profile on Ms. Niesz's underwear and concluded that it was his semen. (ECF No. 13-23 at 627:22–628:10.) On cross-

---

[6] Another analyst tested the kit and examined the underwear; Ms. Annitto reviewed that analyst's notes. (ECF No. 13-23 at 634:16–635:14.)

5

examination, Mr. Fonte established that Ms. Annitto could not determine how long the DNA found on Ms. Niesz's underwear had been there. (ECF No. 13-23 at 636:5–7.)

### B. *The Defense Case*

The petitioner did not call any witnesses.

### C. *Verdict and Sentencing*

On September 28, 2010, the jury found the petitioner guilty of Rape in the First Degree, Aggravated Criminal Contempt, and Burglary in the Second Degree, and acquitted him of Burglary in the Second Degree and Criminal Contempt. (ECF No. 13-24 at 812:10–20.)

On November 3, 2010, Judge Collini sentenced the petitioner as a predicate felon to concurrent sentences of twenty-three years for the rape, fifteen years for the burglary, and three-and-a-half to seven years for criminal contempt, with twenty-five years of post-release supervision. (ECF No. 13-25 at 19:7–19.)[7]

## PROCEDURAL HISTORY

### I. 330.30 Motion to Set Aside Verdict[8]

On October 23, 2010—after the verdict, but before sentencing—the petitioner filed a *pro se* C.P.L. § 330.30 motion, claiming that the court should not have admitted the knife recovered at the crime scene, and that Ms. Annitto's testimony violated the Sixth Amendment right to confrontation because it was "hearsay" and based on another lab analyst's notes. (ECF No. 13-1 at 1.) He also alleged that he was denied the right to be present at side bar conferences, and that

---

[7] After the verdict but before sentencing, the petitioner told Judge Collini that he wanted to represent himself; Judge Collini granted the motion after a colloquy. (ECF No. 13-2 at 3.) At sentencing, the petitioner confirmed that he wanted to represent himself. (ECF No. 13-25 at 2:8–15.) Mr. Fonte was present as standby counsel. (*Id.* at 18:6–9.)

[8] The petitioner says that he also moved under C.P.L. § 220.10 (ECF No. 9 at 7), but this motion does not appear in the record.

his conviction was a result of "falsified legal documents." (*Id.*) Finally, the petitioner claimed that testimony about the April 2009 menacing conviction was unfairly prejudicial. (ECF No. 13-1 at 3.)

Judge Collini denied the petitioner's motion as "procedurally barred" and "without merit." (ECF No. 13-25 at 2:16–25.) The petitioner did not seek leave to appeal the denial of his motion.

## II. 440.10 Motion to Vacate Judgment

On November 3, 2010, the petitioner filed a *pro se* motion to vacate the judgment pursuant to C.P.L. § 440.10. (ECF No. 13-3.) He claimed that the prosecutor introduced "falsified legal documents," that Judge Collini should have held an evidentiary hearing about the admissibility of the knife, and that Ms. Annitto's testimony was perjured. (*Id.* at 1–2.) The petitioner made a general challenge to the *voir dire* process. (*Id.* at 2.) Citing a letter from an alternate juror, the petitioner argued that "bias [and] prejudice" pervaded his trial. (*Id.*) He also made general allegations of prosecutorial misconduct and violations of "due process" and "equal protection" rights. (*Id.*)

On March 8, 2011, Judge Collini denied the petitioner's motion as "entirely baseless and otherwise without merit." (ECF No. 13-2 at 4.) The motion was procedurally barred because the petitioner's direct appeal was pending and "sufficient facts appear in the record . . . to permit adequate appellate review." (*Id.*) (citing C.P.L. § 440.10(2)(b)). The petitioner's reliance on the alternate juror's letter was "without merit" and "contradicted by the record," because the letter was primarily a list of complaints and made no claim of juror misconduct. (ECF No. 13-2 at 4.) In any event, the alternate juror did not deliberate, and the record supported the verdict. (*Id.* at 4–5.) The petitioner did not seek leave to appeal the denial of his motion.

7

## III. Direct Appeal

Represented by counsel, the petitioner appealed to the Appellate Division, Second Department. (ECF No. 13-6.) Counsel argued that the admission of the petitioner's menacing conviction violated *People v. Molineux*, 168 N.Y. 264 (1901), and that the trial court's limiting instruction did not cure the prejudice. (*Id.* at 16–28.)

The petitioner also submitted a *pro se* supplemental brief in which he renewed his Sixth Amendment argument about Kerry Annitto's testimony. (ECF No. 13-9 at 7–17, 19, 30–31.) He also claimed that the prosecutor had an obligation to "correct" Ms. Annitto's allegedly false testimony. (*Id.* at 23–25, 30.) In addition, he attacked the performance of his lawyers: Mr. Kopacz improperly waived his right to testify before the grand jury and had a conflict, Mr. Zuntag did not raise the conflict in a timely manner, and Mr. Fonte should have objected to Ms. Annitto's testimony and moved to dismiss the case. (*Id.* at 20–21, 27–30.)

The Appellate Division, Second Department affirmed the conviction on March 6, 2013. *People v. Reddick*, 104 A.D.3d 708 (2d Dep't 2013). The court found that the underlying facts of the petitioner's menacing conviction were properly admitted, and that "the probative value of the admitted evidence outweighed any prejudice to the [petitioner]," and that the "verdict of guilt was not against the weight of the evidence."[9] *Id.* at 708. The court held that the *pro se* ineffective assistance of counsel claim was based in part "on matter[s] outside the record," and was thus more properly the subject of a § 440.10 motion; nevertheless, the existing record did not show that the petitioner's counsel was ineffective. *Id.* at 709. The court found that the remaining *pro se* arguments were "unpreserved for appellate review, and in any event, without merit." *Id.*

---

[9] The court also found that the claim was not preserved. *Id.* at 708.

On March 8, 2013, the petitioner's counsel sought leave to appeal to the Court of Appeals, citing the admission of the petitioner's menacing conviction. (ECF No. 13-11 at 2–3.) On March 29, 2013, the petitioner also sought leave to appeal *pro se*, raising some of the same arguments he made in his *pro se* submission to the Appellate Division. (ECF No. 13-13 at 1–2.)

On April 30, 2013, the Court of Appeals denied both applications for leave to appeal. (ECF No. 13-15.)

## IV. 440.20 Motion to Set Aside Sentence

On November 10, 2010—while the direct appeal was pending—the petitioner filed a C.P.L. § 440.20 motion to set aside his sentence. He repeated the allegations in his November 3, 2010 motion, and added a challenge to Judge Collini's finding that he was a second felony offender. (ECF No. 13-2 at 2 n.1, 6.) Judge Collini denied this motion as "baseless, conclusory, vague and belied by the record." (*Id.* at 6.) He further found that the petitioner's second felony offender claim was "without merit and contradicted by the record," and that the prosecutor had "establish[ed] beyond a reasonable doubt the existence of [the petitioner's] prior felony conviction." (*Id.*)

## DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires that a federal court reviewing a state prisoner's habeas petition to give deference to a state court's decision on the merits. 28 U.S.C. § 2254(a). The federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also*

9

*Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116–17 (2d Cir. 2015).

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412-13. The state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). In other words, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The petitioner alleges ineffective assistance of counsel, insufficiency of the evidence, prosecutorial misconduct, and violations of the Sixth Amendment right of confrontation.[10] For the reasons that follow, the petition is denied.

---

[10] The petitioner filed a reply brief on January 8, 2015 (ECF No. 17) and letters to the Court on January 22, 2015 (ECF No. 18), June 13, 2016 (ECF No. 20), February 13, 2017 (ECF No. 21), August 17, 2017 (ECF No. 22), November 8, 2017 (ECF No. 23), July 12, 2018 (ECF No. 24), August 2, 2018 (ECF No. 25), September 7, 2018 (ECF No. 26), September 17, 2018 (ECF Nos. 27, 28), and September 24, 2018 (ECF No. 29). In light of the petitioner's *pro se* status, I construe these responses collectively as the petitioner's reply.

## I. Ineffective Assistance of Counsel

A defendant claiming ineffective assistance of counsel must show (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). To satisfy the first prong, "[a] convicted defendant . . . must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "[A] petitioner cannot prevail on a claim of ineffective assistance merely because he disagrees with his counsel's strategy." *Singleton v. Duncan*, No. 03-CV-561, 2006 WL 73734, at *14 (E.D.N.Y. Jan. 10, 2006) (citing *Jones v. Barnes*, 463 U.S. 745, 752 (1983)). Courts assessing whether counsel was ineffective "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. The second prong of the *Strickland* test is satisfied only if the petitioner establishes that there is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "The level of prejudice the defendant need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 693). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

Because the Appellate Division rejected the petitioner's ineffective assistance claims, *Reddick*, 104 A.D.3d at 709, the inquiry here is whether the state decision was "contrary to, or

involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Johnson*, 568 U.S. at 292. On federal habeas review, the ineffective assistance review is "different from asking whether defense counsel's performance fell below *Strickland's* standard;" a state court must be granted a "deference and latitude that are not in operation when the case involves a review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101. A federal court "must determine what arguments or theories supported, or . . . could have supported, the state court's decision," and must then determine "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* at 102.

The petitioner claims that three of his lawyers were ineffective: Mr. Kopacz because he waived the petitioner's right to testify before the grand jury and had a conflict; Mr. Zuntag because he did not make a timely claim that Mr. Kopacz was ineffective; and Mr. Fonte because he did not object to the DNA expert's testimony.[11] The Appellate Division reasonably applied *Strickland* when it rejected these claims below.[12]

The petitioner has not established that the lawyers who represented him in in pre-trial proceedings acted unreasonably. The petitioner's grand jury claim does not state a federal claim.

---

[11] In his reply, the petitioner raises additional claims: that Mr. Fonte should have objected to the jury charge, introduced an allegedly exculpatory recording of a call between the petitioner and the victim, and put on a defense. (ECF No. 17 at 3, 5; ECF No. 20 at 1.) He also faults Mr. Fonte for meeting with the petitioner only four times before trial (ECF No. 17 at 3; ECF No. 23 at 2) and for failing to investigate the possibility that Ms. Niesz was motivated by her desire to gain custody of her son (ECF No. 26 at 1). The one-year statute of limitations has run on these claims, *see* 28 U.S.C. § 2244(d)(1), which are all in any event, unexhausted and meritless.

[12] The petitioner has exhausted his state remedies only as to his ineffective assistance claim that Mr. Fonte did not object to inadmissible testimony. (ECF No. 13-13.) *See* 28 U.S.C. § 2254(b) (Applicants for habeas corpus relief must "exhaust[] the remedies available in the courts of the State."); *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990) (per curiam). The petitioner has not shown, as he must, "cause for the [procedural] default and actual prejudice as a result of the alleged violation of federal law," nor has he "demonstrate[d] that failure to consider the claims will result in a fundamental miscarriage of justice." *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

There is no federally-cognizable ineffective assistance claim concerning advice regarding the state grand jury process. *Davis v. Mantello*, 42 F. App'x 488, 491 n.1 (2d Cir. 2002) ("A defendant's right to testify before the grand jury is not a constitutional right; rather, it is a [state] statutorily created right," and "New York courts have consistently held that counsel's failure to ensure that the defendant testifies before the grand jury does not amount to ineffective assistance of counsel."). Similarly unavailing is the petitioner's claim that his second lawyer should have alerted the state court to Mr. Kopacz's supposed conflict—that Mr. Kopacz "represented the . . . victim and [the] petitioner at the same time," in June 2009. (ECF No. 9 at 6.) The record shows that another attorney at Mr. Kopacz's firm represented Ms. Niesz. (ECF No. 13-18 at 1, ECF No. 13 at 2). *United States v. Noble*, 363 F. App'x 771, 773 (2d Cir. 2010) ("An attorney's '[f]ailure to make a meritless argument does not amount to ineffective assistance.'") (quoting *United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999)). In any case, neither Mr. Kopacz nor Mr. Zuntag during their short stints as the petitioner's attorneys could have changed the outcome at trial. *See Dixon v. McGinnis*, 492 F. Supp. 2d 343, 348 (S.D.N.Y. 2007) (Court dismissed ineffective assistance claim where the petitioner "failed to demonstrate that the outcome of the proceedings would have been different had the motion [to dismiss the indictment] been filed on time.") (citing *Strickland*, 466 U.S. at 689)).

The petitioner's arguments about his trial lawyer, Mr. Fonte, are no more convincing. The petitioner claims that Mr. Fonte should have objected to the evidence that DNA analyst Annitto relied in part on another analyst's notes. "Even where an objection would have been sustained, an attorney is not required to raise an objection in order to render effective assistance." *Nowicki v. Cunningham*, No. 09-CV-8476, 2014 WL 5462475, at *25 (S.D.N.Y. Oct. 27, 2014), *aff'd*, 669 F. App'x 52 (2d Cir. 2016); *see Premo v. Moore*, 562 U.S. 115, 124 (2011) ("[T]he

relevant question under *Strickland*" is not whether the motion or objection "would have succeeded," but instead whether "no competent attorney would think a [motion or objection] would have failed.") (citation omitted).[13] Given the defense strategy, Mr. Fonte had no reason to object. He argued that the petitioner's DNA on Ms. Niesz's underwear was from a prior consensual encounter. Thus, the central point he wanted to make was that the expert could not tell how long the DNA had been on the underwear, which he did. (ECF No. 13-23 at 636:5–7.) *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) ("Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance." (internal quotations and citations omitted)). This was a reasonable strategic decision, which in any event, did not affect the outcome of the trial. *See Lockhart v. Fretwell*, 506 U.S. 364, 366 (1993) ("Because the result of the . . . proceeding . . . was rendered neither unreliable nor fundamentally unfair as a result of counsel's failure to make [an] objection," petitioner did not demonstrate prejudice under *Strickland*.).

Indeed, the petitioner was convicted not because of any deficiency on his lawyers' part, but because of the strength of the evidence against him. Ms. Niesz's testimony was compelling, (*see* ECF No. 13-22 at 503–25), and was corroborated by the evidence of her demeanor when the police arrived, by the presence of the knife where she stated it would be (*id.* at 446:15–18, 448:4–449:4), and by the observations of medical personnel (ECF No. 13-23 at 682:2–13).

---

[13] The petitioner also claims Mr. Fonte was ineffective because he failed to move for dismissal when Judge Collini allegedly "stated [that] half of [the] alleged victim[']s testimony was considered perjured" (ECF No. 9 at 6), but there is no evidence in the record that Judge Collini made such a statement.

14

## II. Sufficiency of the Evidence

The petitioner also alleges that his "guilt [could] not [have been] proven beyond a reasonable doubt" without the DNA evidence.[14] (ECF No. 9 at 5.) As explained above, the DNA evidence was properly admitted at trial. In any event, the Appellate Division held that this claim was "unpreserved for appellate review" and "without merit." *Reddick*, 104 A.D.3d at 709. The court relied on C.P.L. § 470.05, which preserves for review only those questions of law as to which "a protest . . . was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." *See Garcia v. Lewis*, 188 F.3d 71, 78 (2d Cir. 1999) (citing C.P.L. § 470.05). New York's contemporaneous objection rule is an independent and adequate state procedural rule that bars federal habeas review. *See Hamilton v. Lee*, 707 F. App'x 12, 14 (2d Cir. 2017) (summary order) ("'[T]here is no question that the claimed procedural bar,' the failure to comply with New York's contemporaneous objection rule, 'constitutes an 'independent' state ground of decision.'") (quoting *Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003)); *Garcia*, 188 F.3d at 77, 82 ("[T]he Appellate Division['s] rul[ing] that [the petitioner] failed to preserve his public trial claim for appellate review" constituted "an independent and adequate state ground of decision that precludes federal habeas review.").

The Appellate Division's decision was not "contrary to," or "an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d). "[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

---

[14] The petitioner has exhausted this claim before the Appellate Division (*see* ECF No. 13-9 at 16–17) and the Court of Appeals (*see* ECF No. 13-13 at 1) (stating that had the trial court excluded Ms. Annitto's testimony, "the [petitioner] would have not been found guilty.").

15

charged.'" *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). A petitioner is entitled to habeas relief under 28 U.S.C. § 2254 only when "view[ing] the evidence in the light most favorable to the government, and constru[ing] all permissible inferences in its favor," there is not sufficient evidence to support the conviction. *United States v. Carson*, 702 F.2d 351, 361 (2d Cir. 1983). As noted above, the evidence against the petitioner, even without the DNA evidence, was overwhelming.

## III. Prosecutorial Misconduct

The petitioner's claims of prosecutorial misconduct—that the prosecutor allowed Ms. Annitto's "knowingly false testimony to go uncorrected" (ECF No. 9 at 5)—is exhausted (ECF No. 13-13).[15] The Appellate Division held that this claim was "unpreserved for appellate review and, in any event, without merit." *Reddick*, 104 A.D.3d at 709. As discussed above, *supra* p. 15, this is an independent and adequate state ground that bars federal habeas review. The claim is, in any event meritless, because there is no evidence that the witness' testimony was false.

## IV. Confrontation Clause

The petitioner alleges that Ms. Annitto's testimony violated his Sixth Amendment right of confrontation because Ms. Annitto did not personally collect the DNA sample from Ms. Niesz's underwear. (ECF No. 9 at 8–10.) Thus, the petitioner argues the trial court admitted the contents of the analyst's notes, which were "testimonial" out-of-court statements under *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) and *Bullcoming v. New Mexico*, 564 U.S.

---

[15] The petitioner's claim that the prosecution erred when it failed to alert the court and the petitioner that "the actual forensic analyst was unavailable to testify" (ECF No. 13-9 at 30) does not state a constitutional violation for federal review. The Appellate Division dismissed this claim as unpreserved, which serves as an independent and adequate state ground that bars federal habeas review.

647 (2011), without giving him the opportunity to confront and examine the analyst in violation of the Sixth Amendment. (ECF No. 9 at 9.)[16]

The petitioner has not shown that the Appellate Division unreasonably applied *Melendez-Diaz* and *Bullcoming*.[17] "*Melendez-Diaz* and *Bullcoming* together suggest that a laboratory analysis is testimonial *only* when 'the circumstances under which the analysis was prepared, viewed objectively, establish that the primary purpose of a reasonable analyst in the declarant's position would have been to create a record for use at a later criminal trial.'" *Washington v. Griffin*, 876 F.3d 395, 405 (2d Cir. 2017), *cert. denied*, 138 S.Ct. 2578 (2018) (quoting *United States v. James*, 712 F.3d 79, 94 (2d Cir. 2013)). At the petitioner's trial, Ms. Annitto apparently referred to the contemporaneous observations of the analyst who extracted the DNA sample from Ms. Niesz's underwear (ECF No. 13-23 at 635:1–14), and not to a document that was prepared for trial. The Supreme Court affirmed a conviction in *Williams v. Illinois*, 567 U.S. 50 (2012), on nearly identical facts.[18] *See Washington*, 876 F.3d at 410 ("'[I]n light of the factual similarities between *Williams* and the present case,' the Appellate Division's decision here cannot be deemed an unreasonable application of clearly established Supreme Court precedent.") (citations omitted). Thus, the state court's rejection of this claim was not a contrary or

---

[16] This claim has been exhausted (*see* ECF No. 13-13 at 1–2), but the Appellate Division's holding that the claim is unpreserved is an independent and adequate state ground that bars federal review. *See supra* p. 15; *Chrysler*, 806 F.3d at 119 ("Under New York law, a defendant does not preserve a Confrontation Clause claim unless he specifically objects to the introduction of the relevant evidence on constitutional grounds."). Despite the petitioner's allegations, Mr. Fonte's failure to object at trial did not amount to ineffective assistance, *see supra* pp. 13–14, nor will failure to review this claim result in a miscarriage of justice. *Coleman*, 501 U.S. at 748.

[17] The Supreme Court, in *Melendez-Diaz*, held that sworn, notarized certificates of lab analysts, which detailed the weight of the bags and affirmed that they had been examined and were filled with cocaine, were testimonial statements, 557 U.S. at 308–10, and, in *Bullcoming*, held that a signed certification about the defendant's blood-alcohol concentration was testimonial, 564 U.S. at 665.

[18] Williams objected to the DNA expert's testimony that the DNA from the victim's vaginal swabs matched the Williams' DNA even though the testifying expert did not develop the DNA profile from the vaginal swabs; the expert relied on a report from an outside lab to the effect that the swabs were taken from the victim and that the outside lab extracted the DNA profile from the swabs. 567 U.S. at 60–64.

17

unreasonable application of the Supreme Court holdings. *Washington*, 876 F.3d at 405; *see Harrington*, 562 U.S. at 102.

## CONCLUSION

Accordingly, the petition for writ of habeas corpus is denied in its entirety. The case is dismissed; and a certificate of appealability will not be issued. *See* 28 U.S.C. § 2253.

**SO ORDERED.**

                                                       s/Ann M. Donnelly

                                                       The Honorable Ann M. Donnelly
                                                       United States District Judge

Dated: Brooklyn, New York
       September 28, 2018